

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Grey Apple iPhone Cell Phone<br>Seized as FP&F No. 2023565300041802 Line Item 0001<br>("Target Device 1") | )<br>)<br>)<br>)<br>)    Case No.  **23MJ0909-JLB** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling | |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Giancarlo Lugo, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: _____03/14/2023_____

_____
*Judge's signature*

City and state: _____San Diego, California_____

HON. Jill L. Burkhardt, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1.      I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Grey Apple iPhone Cell Phone
> Seized as FP&F No. 2023565300041802 Item 0001
> (**"Target Device 1"**)
>
> Purple Motorola Cell Phone
> Seized as FP&F No. 2023565300041804 Item 0001
> (**"Target Device 2"**)

the **Target Devices**, as further described in Attachment A-1 and A-2, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.      The requested warrants related to the investigation and prosecution of Michael BRAVO, Rafael HERNANDEZ, and Roman RIOS-Vidana for attempting to transport and move illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.   Dates and times are approximate.

//

//

1

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.    The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

3

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.   On March 9, 2023, Border Patrol Agent B. May was performing assigned duties in the Brown Field Border Patrol Station's area of responsibility. At approximately 7:00 AM, Agent May, while traveling on Marron Valley Road (MVR,) was approached by a Brown Field Border Patrol Agent who informed him of a gray Nissan Versa that, earlier, had been southbound on MVR and was now northbound. The Agent further informed Agent May that there were two visible male occupants who appeared to display nervous behavior when they saw him in a marked Border Patrol vehicle.

12.   Agent May, who was in an unmarked unit, proceeded to follow the vehicle as it turned eastbound on Highway 94. The Versa appeared to be heavily laden, and the vehicle was driving below the posted speed limits. Agent May requested records check on the Versa as well as the assistance of Office of Air and Marine helicopter (Troy) for aerial observation. Agent May initiated the stop with Border Patrol Agent S. Moran as backup in his marked Border Patrol Vehicle. Initially, the vehicle pulled to the side of the road as if to allow Agent May to pass, however, the driver, later identified as defendant Michael BRAVO, realized it was him who was being pulled over, failed to yield and kept driving at a high rate of speed. Troy was maintaining visual of the vehicle while all pursuing agents maintained a safe speed and distance. Agent May continually broadcasted the Versa's rate of speed and direction of travel.

13.   Several attempts were made using Controlled Tire Deflation Devices (CTDD;) however, BRAVO was able to avoid them. In one instance, BRAVO, traveling at 70MPH, swerved to avoid the CTDD causing the Agent to dive out of the way to avoid being struck. Agent Moran took over as primary pursuit vehicle at this point continually calling out speed, traffic conditions, location and direction.

5

14.     Later on Buckman Springs, northbound, BRAVO was passing traffic crossing over double yellow lines, in a school zone at excessive speeds.  A final attempt, using the CTDD, was successful on BRAVO's vehicle on Buckman Springs.  The Versa came to a stop just south of the intersection of Interstate 8.  This location is approximately 10 miles east of the Tecate, California Port of Entry and approximately 12 miles north of the United States/Mexico International Border.

15.     When Agent May arrived on scene, there were three male subjects sitting outside the vehicle on the ground, and two principal subjects, secured in separate marked Border Patrol vehicles.  Agent May approached the three individuals, later identified as defendant Roman RIOS-Vidana, material witnesses Jesus Eduardo ASTORGA-Angulo, Manuel Alfredo SANCHEZ, and conducted an immigration inspection.  Each individual stated that they are citizens of Mexico and not in possession of immigration documents allowing them to be or remain in the United States legally.  At 8:00 AM, Agent May placed RIOS, ASTORGA, and SANCHEZ under arrest.  Agent May then conducted an immigration inspection of the driver, later identified as defendant Michael BRAVO and the front passenger, later identified as defendant Rafael HERNANDEZ.  Each individual stated that they are United States citizens.  At 8:00 AM, Agent May placed BRAVO and HERNANDEZ under arrest for alien smuggling.

16.     At the time of arrest, a grey Apple iPhone Cell Phone (**Target Device 1**), was recovered from HERNANDEZ's person, and a purple Motorola cell phone (**Target Device 2**) was found in RIOS' pants pocket. Both of these devices were subsequently seized. HERNANDEZ and RIOS both claimed that the phones that were found were their phones.

17.     Defendant Michael BRAVO was read his Miranda rights and stated that he understood his rights and was willing to speak without the presence of an attorney. BRAVO stated that he lives in Los Angeles, California and works as a taxi driver.  BRAVO stated that a few days ago he saw a video through the social media application TikTok in which a person was requesting drivers to pick up immigrants which he knew it was for

undocumented aliens. BRAVO stated that he messaged the TikTok page and was soon contacted by an individual through the mobile application WhatsUp. BRAVO stated that the individual wanted to meet up in person in Chula Vista, California. BRAVO stated that he drove to Chula Vista but was not able to contact the individual, so he drove back to Los Angeles. BRAVO stated that last night the individual contacted him and offered him a "Jale", Spanish slang for job. BRAVO stated that the job was to pick up four individuals for $2,000 USD per person. BRAVO stated that on the day of the event he was instructed to send a photo of his vehicle and to drive to a locally known fast food establishment and was later told to drive to another location near the trolley. BRAVO stated that while waiting an individual, identified as defendant HERNANDEZ, entered his vehicle. Soon after, BRAVO stated he received a pin drop location and drove to the location in Dulzura, California. BRAVO stated that he drove onto a dirt road where he saw an undercover agent in a brown Suburban. BRAVO stated that he drove for five minutes until he reached the pin location where he honked once, and three individuals entered his vehicle. BRAVO stated that he then received a pin location to drive back to Anahiem, California. BRAVO stated he drove back onto the main road and saw the brown undercover vehicle fast approaching from behind. BRAVO stated that the vehicle behind him, activated the lights and sirens and he was going to pull over, but HERNANDEZ told him "Pisale, Pisale", which is Spanish for step on it. BRAVO stated that he continued driving and Border Patrol agents threw spikes on the road, but he drove around them and came really close to an agent. BRAVO stated that an undercover vehicle hit his vehicle and he almost lost control. BRAVO stated that he continued driving and finally stopped when he was spiked, and his tires deflated. BRAVO stated that HERNANDEZ kept telling him "Dale, "Dale", Spanish for Go.

18.     Defendant Rafael HERNANDEZ was read his Miranda rights and stated that he understood his rights and was willing to speak without the presence of an attorney. HERNANDEZ stated that last night while at his home in Tijuana, Baja California, Mexico,

he responded to a job offer through the social media platform Facebook. HERNANDEZ stated that he agreed to the job for $500 USD and was instructed to cross the San Ysidro, California Port of Entry on foot, and a vehicle would pick him up. HERNANDEZ stated that he crossed the port and soon after a vehicle driven by defendant BRAVO approached and he got in. HERNANDEZ stated that shortly after, BRAVO received a pin drop for the pick-up location. HERNANDEZ stated that they drove to the location and when they arrived, BRAVO yelled the code word "43" and three individuals emerged from the brush and entered the vehicle. HERNANDEZ stated that they drove back to the paved road and after several minutes a Border Patrol vehicle activated its lights and sirens. HERNANDEZ stated that he told BRAVO to pull over, but BRAVO ignored his request and said, "I'm not gonna get caught, I have to pay the car off". HERNANDEZ stated that there were several attempts by Border Patrol to spike the vehicle and at one point came really close to an agent. HERNANDEZ stated he felt unsafe during the pursuit.

19.    Material Witnesses ASTORGA and SANCHEZ stated that they are citizens of Mexico without immigration documentation allowing them to be or remain in the United States legally. Further, that they illegally entered the United Stated on March 8, 2023, by walking through the mountains. ASTORGA and SANCHEZ further stated that they were going to pay a smuggling fee between $8,500 USD to $9,000 USD. ASTORGA further added that RIOS, the foot-guide of this event, was arrested with the group. ASTORGA and SANCHEZ went on to say that they were guided through the mountains until reaching the South Bay Rod and gun Club. SANCHEZ further added that the RIOS was in contact with the load vehicle until it arrived. Upon the load vehicle's arrival, HERNANDEZ, the passenger in the load vehicle, and RIOS instructed ASTORGA and SANCHEZ to get in. ASTORGA and SANCHEZ stated that shortly after driving off, Border Patrol Units were behind them attempting to pull them over. Further, that SANCHEZ was instructing BRAVO, the driver of the load vehicle, not to stop. ASTORGA and SANCHEZ further added that the vehicle came to a stop after having rammed into a government vehicle.

ASTORGA and SANCHEZ were arrested shortly thereafter. ASTORGA and SANCHEZ, by use of several photo lineups, were able to positively identify BRAVO, as the driver of the load vehicle, HERNANDEZ as the passenger in the load vehicle, and RIOS as the foot-guide in this event.

20.    Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **February 9, 2023, through March 9, 2023**.

## METHODOLOGY

21.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22.    Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

23.    Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

24.    Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

//
//

**CONCLUSION**

25.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

26.     Because the **Target Devices** were seized at the time of HERNANDEZ and RIOS' arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **February 9, 2023, through March 9, 2023.**

27.     Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2, seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.


_____
Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of March 2023.


_____
HON. JILL L. BURKHARDT
United States Magistrate Judge

1

## **ATTACHMENT A-1**

2

PROPERTY TO BE SEARCHED

3

The following property is to be searched:

4

Grey Apple iPhone Cell Phone
Seized as FP&F No. 2023565300041802 Item 0001

5

**("Target Device 1")**

6

7

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 9, 2023, through March 9, 2023**:

a.    tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.